**BAILEY LAW FIRM, PLLC**
Jenna C. Bailey (029333)
2169 East Warner Road, Suite 104
Tempe, Arizona 85284
(480) 681-5408 Main Phone
(480) 302-7881 Fax
minuteentries@baileylawfirmaz.com
jbailey@baileylawfirmaz.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Manuela M. Valenzuela, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>Syngenta Crop Protection, LLC., a Delaware Corporation; Syngenta AG, a Delaware Corporation; Chevron U.S.A., LLC., a Delaware Corporation and Doe Defendants 1-20; ABC Corporations 1-10; and XYZ Companies 11-20,<br><br>Defendants. | Case No:<br><br>**COMPLAINT**<br><br>(Strict Products Liability, Design Defect; Strict Products Liability, Failure to Warn; Negligence; Breach of Implied Warranties) |

Plaintiff Manuela Valenzuela, by and through undersigned counsel, for her causes of action against the Defendant, states and alleges the following:

### **IDENTIFICATION OF PARTIES**

1. Plaintiff Manuela Valenzuela (hereinafter "Plaintiff") is an individual residing in Santa Cruz County, Arizona.

2. Defendants Syngenta Crop Protection, LLC. ("SCPLLC") is a Delaware corporation with its headquarters and principal place of business in Wilmington, Delaware. At all times relevant to this complaint, SCPLLC was the entity that manufacture Paraquat Dichloride ("PARAQUAT"). SCPLLC has regularly transacted and conducted business within the State of Arizona and has derived substantial revenue from herbicides used in U.S. commercial agriculture, including Paraquat, used in the state of Arizona. SCPLLC

1

expected or should have expected its acts to have consequences within the State of Arizona and derived substantial revenue from interstate commerce.

3.     Defendants Syngenta Crop Protection, LLC, was at all relevant times, a Foreign limited liability company authorized to engage in business in the State of Arizona and having a Statutory Agent for service of process as follows: United Agent Group, Inc, 2942 N. 24th St. #133, Phoenix, AZ 85016.

4.     Defendants Chevron U.S.A., LLC ("CHEVRON") is a Delaware corporation with its headquarters and principal place of business in Wilmington, Delaware. At all times relevant to this complaint, CHEVRON was the entity that was the exclusive distributor of Paraquat. CHEVRON has regularly transacted and conducted business within the State of Arizona and has derived substantial revenue from the distribution of Paraquat, used in the state of Arizona. CHEVRON expected or should have expected its acts to have consequences within the State of Arizona and derived substantial revenue from interstate commerce.

5.     Defendants Chevron U.S.A., LLC, was at all relevant times, a Foreign limited liability company authorized to engage in business in the State of Arizona and having a Statutory Agent for service of process as follows: The Prentice-Hall Corporation 7955 S. Priest Dr., Suite 102, Tempe, Arizona 85284.

6.     Imperial Chemical Industries Limited ("ICI Limited") and certain ICI Limited subsidiaries from approximately June 1981 through approximately September 1986, Imperial Chemical Industries PLC ("ICI PLC") and certain ICI PLC subsidiaries, each of which was a predecessor of Defendants Syngenta AG ("SAG") and/or Defendants Syngenta Crop Protection LLC ("SCPLLC"), were engaged, directly, acting in concert

with each other, and/or acting in concert with Chevron Chemical Company, previously known as California Chemical Company ("CHEVRON"), in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in paraquat products, and developing, registering, formulating, and distributing paraquat products, for sale and use in the U.S., including Arizona ("the U.S. paraquat business").

7.    Unless otherwise stated, "Defendants Syngenta AG ("SAG") and/or Defendants Syngenta Crop Protection LLC ("SCPLLC") " shall be referred collectively as (SYNGENTA") and their agents and/or employees.

8.    Unless otherwise stated, "Defendants" shall refer collectively to all Defendants and their agents and/or employees.

9.    Plaintiff is informed and believes, and based thereon alleges, that in committing the acts alleged herein, each and every managing agent, agent, representative, and/or employee of Defendants were working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification, and authorization of Defendants and its directors, officers and/or managing agents.

10.    Doe Defendants 1-20 are sued fictitiously in that their correct names and legal identities are currently unknown to Plaintiff. Said Doe Defendants participated with the named Defendants as agents, employees, servants, masters, principals, partners, limited partners, subsidiary corporations, contractors, or other types of business or professional associations in providing services through Defendants. Doe Defendants may include individuals either employed by Defendants or outside entities, whose negligence will not become known to Plaintiffs until discovery progresses.

11. Defendants ABC Corporations 1-10 and XYZ Companies 11-20 are sued fictitiously in that their correct names and legal identities are currently unknown to Plaintiff. Such fictitious corporations and companies are/were the professional corporations, partnerships, limited partnerships, contractors, and/or associations of the named Defendants and/or participated with the named Defendants as agents, employees, servants, masters, principals, partners, limited partners, subsidiary corporations, or professional associations through Defendants.

**JURISDICTION AND VENUE**

1. Jurisdiction and There is a complete diversity of citizenship between the parties. Defendants are domiciled in Delaware. Plaintiff is domiciled in Arizona.

2. Venue is appropriate as Plaintiff is a resident of Pima County, Arizona.

3. The amount in controversy exceeds $75,000.00.

12. Accordingly, Jurisdiction is appropriate in this Court pursuant to 28 U.S. Code § 1332(a).

13. The Court has jurisdiction over non-residents who transact business in the State of Arizona based on the state laws, statutes, and regulations currently in effect.

4. SYNGENTA is active daily in the State of Arizona and has the necessary minimum contacts required by the constitution.

5. CHEVRON is active daily in the State of Arizona and has the necessary minimum contacts required by the constitution.

6. All acts, errors, and omissions of Defendants complained of herein occurred in Pima County, Arizona.

**COMMON ALLEGATIONS**

4

12. Plaintiff incorporates by reference each and every allegation above as if fully set forth herein.

13. Paraquat is a broad-spectrum, non-selective herbicide used in a wide variety of herbicidal products around the world.

14. Plants treated with Paraquat translocate the systemic herbicide to their roots, shoot regions and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb Paraquat, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains.

15. For nearly 60 years, agribusiness across the world have used Gramoxone without knowing of the dangers its use poses. That is because when SYNGENTA first introduced Gramoxone, it touted Paraquat as a technological breakthrough: it could kill almost every weed without causing harm either to people or to the environment. Of course, history has shown that not to be true.

16. According to the World Health Organization ("WHO"), the main chemical ingredient of Gramoxone – Paraquat – is a probable cause of Parkinson's Disease.

17. SYNGENTA assured the public that Gramoxone was harmless.

**THE DISCOVERY OF PARAQUAT AND DEVELOPMENT OF GRAMOXONE**

12. Paraquat was first synthesized in the late 19th century, but its herbicidal properties were discovered by Imperial Chemical Industries ("ICI"), a British chemical company that would later become a part of Syngenta, in 1955. Paraquat was introduced for commercial use under the brand name Gramoxone. The first paraquet based herbicide was introduced to the market in the 1960's. From the outset, Syngenta marketed Gramoxone as

a "safe" general-purpose herbicide for widespread commercial use. It still markets Gramoxone as safe today.

## REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

12.    The manufacture, formulation, and distribution of herbicides, such as Gramoxone, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

13.    The EPA requires as part of the registration process, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

14.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

15.    The EPA and the State of Arizona registered CHEVRON for distribution, sale, and manufacture in the United States and the State of Arizona.

16.     FIFRA generally requires that the registrant, Syngenta in the case of Gramoxone, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must be submitted to the EPA for review and evaluation. The government is not required, nor is it able, however, to perform the product tests that are required of the manufacturer.

17.     The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered. The data necessary for registration of a pesticide has changed over time. The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration." 7 U.S.C. § 136a-1. In order to reevaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

18.     In the case of Paraquat and Gramoxone, the EPA had planned on released its preliminary risk assessment in relation to the re-registration process no later than October 2019. The EPA completed its review of Gramoxone and released the final Interim Decision in July 2021. In February 2024, the EPA announced the availability of its preliminary reconsideration of the issues raised by petitioners and opened a public comment period on this reconsideration. The EPA has committed to reconsidering its 2021 interim decision and a final decision on the continued registration of paraquat is anticipated in 2025.

**SCIENTIFIC FRAUD UNDERLYING THE MARKETING AND SALE OF PARAQUAT/GRAMOXONE**

7

12.     Based on early studies that paraquat could cause Parkinson's Disease in laboratory animals, EPA's position is that Gramoxone (which contains the active ingredient paraquat) is a highly toxic, "Restricted Use Pesticide" (RUP) that can only be used by certified applicators. In terms of acute toxicity, paraquat is classified as a Category I (the highest toxicity category) for acute inhalation, acute dermal (rabbit), and eye irritation.

13.     In so classifying Gramoxone, however, the EPA made clear that the designation did not mean the chemical does not cause Parkinson's Disease: "It should be emphasized, however, that designation of an agent in Category I is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not cause Parkinson's Disease under any circumstances."

14.     The EPA found that the laboratories hired by Syngenta to test the toxicity of its paraquat products for registration purposes committed fraud.

15.     Syngenta and its predecessor, ICI, hired Central Toxicology Laboratory (CTL), to conduct toxicity testing on paraquat and its formulations to perform and evaluate pesticide toxicology studies relating to Gramoxone. CTL performed numerous tests on paraquat and paraquat-containing products, regarding chronic toxicology studies needed to register Gramoxone with the EPA.

16.     In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT and discovered discrepancies between the raw data and the final report relating to the toxicological impacts of paraquat. The EPA subsequently audited IBT and determined that the toxicology studies conducted for Gramoxone were invalid. An EPA reviewer stated, after finding "routine falsification of data" at IBT, that it was "hard

to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."

17. Three top executives of IBT were convicted of fraud in 1983.

18. In light of the incident of data falsification, Syngenta used its own in-house research facility, the Central Toxicology Laboratory (CTL), to perform the replacement pesticide and herbicide studies required by the EPA.

19. Despite the falsity of the tests that underlie its registration, within a few years of its launch, Syngenta was marketing Gramoxone and was used globally within the agrochemical revolution of the 1960s and 1970s. The European Union banned paraquat dichloride due to safety concerns. Paraquat is banned or heavily restricted in over 60 countries, but it remains a "restricted use" pesticide in the U.S., meaning only licensed applicators can use it.

## SYNGENTA HAS KNOWN FOR DECADES THAT IT  FALSELY ADVERTISES THE SAFETY OF GRAMOXONE

18. In 2021, The whistleblower statement from former Syngenta toxicologist Jon Heylings became public knowledge as a result of a joint investigation by the journalistic outlets that he warned his superiors for decades that a key safety additive (an emetic or vomiting agent) in Gramoxone was ineffective at preventing fatal poisonings, but that his warnings were ignored. The company allegedly resisted increasing the emetic concentration or diluting the product for cost considerations. Syngenta based on its false and misleading advertising of Gramoxone products. Among the deceptive and misleading about the human and environmental safety of Gramoxone are the following:

a)  Remember that environmentally friendly Gramoxone (paraquat) herbicide is biodegradable. It won't build up in the soil so you can use Gramoxone with confidence in commercial agricultural farms ...

b)  And remember that Gramoxone (paraquat) is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Gramoxone (paraquat) everywhere you've got a weed, brush, edging or trimming problem.

c)  Gramoxone (paraquat) biodegrades into naturally occurring elements.

d)  Remember that versatile Gramoxone (paraquat) herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e)  This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

f)  You can apply Gramoxone (paraquat) with "confidence because it will stay where you put it"[;] it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

13.   You can feel good about using herbicides by Syngenta. New Gramoxone Super. It's Paraquat at its best. On November 19, 1996, SYNGENTA entered into an Assurance of Discontinuance with NYAG, in which SYNGENTA agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

10

a)    its Paraquat-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b)    its Paraquat-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by SYNGENTA are biodegradable.

c)    its Paraquat-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d)    its Paraquat-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)    its Paraquat-containing pesticide products or any component thereof are safer or less toxic than common agribusiness products other than herbicides; and

f)    its Paraquat-containing products or any component thereof might be classified as practically non-toxic.

14.    SYNGENTA did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today.

## CLASSIFICATIONS AND ASSESSMENTS OF PARAQUAT

15.    The Unified Parkinson's Advocacy Council (UPAC) is a coalition of various Parkinson's organizations that works to advocate for policies and research funding at the national level. UPAC urged the federal government to invest in research and change public policy in the causes of Parkinson's Disease.

11

16.    The established procedure for UPAC is they fund research which is conducted by various federal agencies, private foundations, and research institutions.

17.    The Parkinson's Foundation and other groups like the Michael J. Fox Foundation (MJFF) have urged the U.S. Environmental Protection Agency (EPA) to ban paraquat due to its link to Parkinson's disease. During 2009-2016 A study using data from a California Parkinson's disease registry found a strong connection between paraquat exposure and increased risk. The risk increased with longer and more intense exposure, particularly for those diagnosed before age 60.

18.    Between 2018 and early 2023, Parkinson's Research submitted over 40 peer-reviewed studies to the EPA, well in advance of the agency's 2024 review deadline. These studies presented substantial epidemiological, toxicological, and mechanistic evidence linking paraquat exposure to Parkinson's disease. Despite the relevance and timeliness of this data, the EPA declined to review the submissions prior to issuing its interim decision and failed to provide a scientific or procedural justification for this omission.

19.    The EPA's evaluation further relied on a single study involving intranasal administration of liquid paraquat in rats to conclude that inhalation exposure does not result in appreciable brain accumulation. This conclusion disregards a more recent and methodologically robust study in which rats were exposed to paraquat via whole-body inhalation chambers—four hours per day, five days per week, over five weeks—

demonstrating paraquat accumulation in brain regions implicated in Parkinson's pathology[12].

20.    The EPA set Paraquat for review in early 2025. The EPA screens against several key factors to determine if a chemical should be designated as high- or low-priority for a risk evaluation.  The inherent capacity of the chemical to cause adverse health or environmental effects and the likelihood of contact with the chemical. Whether the chemical breaks down slowly in the environment and has the potential to build up in living organisms over time. Consideration of groups that may be at greater risk, such as children, workers, or those in overburdened communities. The circumstances under which the chemical is manufactured, processed, distributed, used, or disposed of, and the volume produced or processed and human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; and related agents similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

21.    The process for the classification of Paraquat followed the stringent procedures for the evaluation of a chemical agent.

22.    The UPAC was wrote a letter to Washington on April 1, 2024 stating, Only about a quarter of Parkinson's disease cases can be linked to potentially causative genetic mutations, implicating environmental exposures as a major contributing factor to

---

[1] Anderson, T., et al., Paraquat Inhalation, a Translationally Relevant Route of Exposure: Disposition to the Brain and Male-Specific Olfactory Impairment in Mice. Toxicol Sci, 2021. 180(1): p. 175-185.
[2] Rojo, A.I., et al., Chronic inhalation of rotenone or paraquat does not induce Parkinson's disease symptoms in mice or rats. Experimental Neurology, 2007. 208(1): p. 120-126.

the disease[3]. Paraquat demonstrated sufficient mechanistic evidence (neurotoxicity and oxidative stress)[4] to warrant Toxicity Category I (the highest of four levels ) for acute inhalation effects in humans and animals.

## OTHER EARLIER FINDINGS ABOUT PARAQUAT'S DANGERS TO

## HUMAN HEALTH

23.    Despite the classification by the EPA, Defendants had ample evidence of Paraquat and Gramoxone's genotoxic properties for decades.

24.    Neurotoxicity refers to Exposure to environmental toxins (e.g., pesticides like rotenone and paraquat, heavy metals) or genetic factors can act as an initial trigger, directly damaging dopaminergic neurons and/or causing mitochondrial dysfunction.

25.    The damaged mitochondria become a major source of reactive oxygen species (ROS). Additionally, the metabolism of dopamine itself produces ROS and highly reactive dopamine quinones, which overwhelms the brain's limited antioxidant defenses (such as glutathione), resulting in chronic oxidative stress. This oxidative stress causes damage to lipids, proteins, and DNA, and promotes the misfolding and aggregation of the protein alpha-synuclein ($\alpha$-syn) into Lewy bodies.

26.    The accumulation of misfolded $\alpha$-syn, neuromelanin released from dying neurons, and other cellular debris act as danger signals that activate the brain's resident immune cells, primarily microglia and astrocytes. These activated glial cells release a

---

[3] De Miranda, B.R., et al., Preventing Parkinson's Disease: An Environmental Agenda. J Parkinsons Dis, 2022. 12(1): p. 45-68.

[4] Dias V, Junn E, Mouradian MM. The role of oxidative stress in Parkinson's disease. J Parkinsons Dis. 2013;3(4):461-91.

cascade of pro-inflammatory mediators, including cytokines (e.g., TNF-α, IL-1β) and more ROS/reactive nitrogen species (RNS) through enzymes like NADPH oxidase.

27. The inflammatory mediators released by activated microglia and astrocytes directly induce oxidative stress in neighboring neurons and compromise their mitochondrial function. This creates a toxic microenvironment that is particularly harmful to the vulnerable dopaminergic neurons, leading to further neuronal death and the release of more toxic factors, thus sustaining the cycle.

28. Both human and animal studies have shown that Paraquat and Paraquat-based formulations such as Gramoxone can induce oxidative stress.

29. Oxidative stress and associated chronic inflammation are believed to be involved in Parkinson's Disease.

30. The Parkinsons Research notes "[s]trong evidence exists that Paraquat, and Paraquat-based formulations can induce oxidative stress."

31. Numerous studies produced evidence of neurological damage showing significantly greater damage after exposure to Paraquat than before in the same individuals, suggesting that the Paraquat formulation used during aerial spraying had a neurotoxic effect on exposed individuals.

32. The Parkinson's Research reflects the volume of evidence of Paraquat pesticides' neurotoxicity noting "[t]he evidence for neurotoxicity caused by Paraquat-based formulations is strong."

33. Despite knowledge to the contrary, Defendants maintain that there is no evidence that Gramoxone is neurotoxic, that regulatory authorities and independent experts

15

agree that Gramoxone is not neurotoxic, and that there is no evidence that Gramoxone is neurotoxic.

34.    In addition to Paraquat and Gramoxone's neurotoxic properties, Defendant has long been aware of Paraquat's neurotoxic properties.

35.    Paraquat, and Gramoxone in particular, have long been associated with neurotoxicity and the development of Parkinson's Disease.

36.    Defendants have known of this association since the early to mid-1950s and numerous human and animal studies have evidenced the neurotoxicity of Paraquat and/or Gramoxone.

37.    In the 1960s, Internal documents from paraquat manufacturers, later released in litigation, show that company scientists identified the potential for paraquat to damage the brain and nervous system as early as the 1950s and 1960s. Animal trials in 1966 reportedly showed high doses caused "stiff gait or tremors" in rodents, symptoms associated with Parkinson's Disease.

38.    In the 1980s, Research began to explore environmental chemicals as potential causes of Parkinson's Disease.

39.    A 1997 study in Taiwan found that a duration of paraquat use of more than 20 years was associated with a significantly increased risk of Parkinson's Disease.

40.    A 1998 study published in Neurology indicated that farmers generally had a 170% greater risk of developing Parkinson's Disease than non-farmers, implicating pesticides in general.

41.    A 1999 study in Brain Research found that paraquat administration in mice killed a subset of dopamine-producing neurons, establishing a mechanistic link in animal models.

42.    A review suggested that paraquat exposure might be an environmental factor contributing to Parkinson's Disease, highlighting the need for further investigation into its mechanism.

43.    In 2009, A major study co-authored by environmental toxin researcher Beate R. Ritz found that paraquat exposure dramatically increased Parkinson's Disease risk, particularly when combined with the fungicide maneb.

44.    In 2011, A highly impactful study in Environmental Health Perspectives (using data from the National Institutes of Health) found that workers exposed to paraquat had a 250% greater risk of developing Parkinson's Disease than those not exposed to the chemical.

45.    In spite of this knowledge, Defendants continued to issue broad and sweeping statements suggesting that Gramoxone was, and is safe, fast, and effective herbicide, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

**PLAINTIFF'S EXPOSURE TO GRAMOXONE**

46.    Plaintiff was employed in produce distribution warehouses in Nogales, Arizona for over 22 years, including at Dynamic Seeds and Mission Fruits and Vegetables.

47.    Plaintiff's role involved continuous exposure to commercial herbicides and weed killers through direct handling, inhalation, and proximity to treated produce during storage and processing. She worked in an open office space located within the processing

17

center and was consistently present in the warehouse environment, actively engaged in inventory processing.

48. In 2022, Plaintiff was medically evaluated and diagnosed with Parkinson's Disease.

49. There is no known family history of Parkinson's disease. Her diagnosis came after years of occupational exposure to agricultural chemicals commonly used in produce handling and distribution.

50. In October 2023, Plaintiff was evaluated for tremors and left-sided weakness noted Neurological exam reveals spastic posturing of the left hand, no resting tremor, and use of an assistive walking device.

51. On October 16, 2023, Plaintiff's MRI of the cervical spine is performed and interpreted as normal, with some degenerative disc disease but no significant cord stenosis.

52. Plaintiff schedules a follow-up visit for tremor; neurological findings and medication regimen.

53. Plaintiff saw Neurologist for tremor and neurological assessment.  It was recommended for Plaintiff to continue Sinemet 25-100 mg and begin physical therapy.

54. On June 25, 2024, Plaintiff had a Neurology follow-up for tremors; Pramipexole Dihydrochloride 0.125 mg was initiated, Sinemet 25-100 mg continued, and Parkinson's disease exercise program recommended.

55. On January 15, 2025, Plaintiff had a Neurological exam which reveals no significant increase in tone or rigidity, no significant resting tremor, and use of an assistive walking device.

56.     In a July 15, 2025, appointment Plaintiff reports being symptomatic throughout the day and needing to get up in the early morning due to symptoms. A referral is made to neurosurgeon for evaluation and treatment.

57.     Plaintiff is scheduled for regular follow-ups to monitor her tremors and Parkinson's disease. The current management plan includes continued observation with a medication regimen.

58.     It has only recently become widely recognized that workers exposed to Gramoxone (paraquat) products face a significantly increased risk of developing Parkinson's disease.

59.     Plaintiff did not become aware of Plaintiff's potential claim against Defendants until on or about February 27, 2025.

## <u>COUNT 1</u>

### **Strict Products Liability (Design Defect)**

60.     Plaintiff incorporates each and every allegation above as if fully set forth herein.

61.     Plaintiff brings this strict liability claim against Defendants for defective design.

62.     At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Gramoxone products, which are defective and unreasonably dangerous to agribusiness, including Plaintiff, thereby placing Gramoxone products into the stream of commerce. These actions were under the ultimate control and supervision of Defendant. At all times relevant to this litigation, Defendants designed, researched, developed,

manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Gramoxone products that Plaintiff was exposed to, as described above.

63. At all times relevant to this litigation, Defendants' Gramoxone products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, and in particular, Plaintiff.

64. At all times relevant to this litigation, Defendants' Gramoxone products reached the intended agribusiness, handlers, and users or other persons coming into contact with these products in Arizona and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

65. Defendants' Gramoxone products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that when they left the hands of the Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which an ordinary agribusiness would contemplate.

66. Defendants' Gramoxone products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants was defective in design and formulation in that when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

67. At all times relevant to this action, Defendants knew or had reason to know that its Gramoxone products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

68.    Therefore, at all times relevant to this litigation, Defendants' Gramoxone products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants was defective in design and formulation, in one or more of the following ways:

a.    When placed in the stream of commerce, Defendants' Gramoxone products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary agribusiness would contemplate.

b.    When placed in the stream of commerce, Defendants' Gramoxone products were unreasonably dangerous in that they were hazardous and posed a grave risk of Parkinson's Disease and other serious illnesses when used in a reasonably anticipated manner.

c.    When placed in the stream of commerce, Defendants' Gramoxone products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner.

d.    Defendants did not sufficiently test, investigate, or study its Gramoxone products and, specifically, the active ingredient Paraquat.

e.    Exposure to Gramoxone products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

21

    f.     Defendants knew or should have known at the time of marketing its Gramoxone products that exposure to Gramoxone could result in Parkinson's Disease and other severe illnesses and injuries.

    g.     Defendants did not conduct adequate post-marketing surveillance of its Gramoxone products.

    h.     Defendants could have employed safer alternative designs and formulations.

69. Plaintiff was exposed to Defendants' Gramoxone, as described above, without knowledge of its dangerous characteristics.

70. At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Gramoxone products in an intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

71. Plaintiff could not have reasonably discovered the defects and risks associated with Gramoxone before or at the time of exposure.

72. The harm caused by Defendants' Gramoxone products far outweighed their benefit, rendering Defendants' products dangerous to an extent beyond that which an ordinary agribusiness would contemplate. Defendants' Gramoxone products were and are more dangerous than alternative products and Defendants could have designed its Gramoxone products to make them less dangerous. Indeed, at the time that Defendants designed its Gramoxone products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

73. At the time Gramoxone products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the

harm without substantially impairing the reasonably anticipated or intended function of Defendants' herbicides.

74. Defendants' defective design of its Gramoxone products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Gramoxone products, including the Plaintiff herein.

75. Therefore, as a result of the unreasonably dangerous condition of its Gramoxone products, Defendants is strictly liable to Plaintiff.

76. The defects in Defendants' Gramoxone products were substantial and contributing factors in causing Plaintiff grave injuries, and, for Defendants' misconduct and omissions, Plaintiff would not have sustained his injuries.

77. As a direct and proximate result of Defendants placing defective Gramoxone products into the stream of commerce, Plaintiff has suffered and continues to suffer grave injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

78. Defendants' conduct, as described above, was reckless. Defendants risked the lives of agribusiness and users of its products, including Plaintiff, with knowledge of the safety problems associated with Gramoxone and Paraquat containing products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn, or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

79. Plaintiff further alleges that Defendants knew or should have known that death and/or catastrophic injuries could occur due to its negligent, careless, and reckless

23

conduct. Nonetheless, Defendants disregarded these dangers and the risks they posed. Such acts and/or omissions constitute willful, wanton, reckless, and malicious behavior and/or a conscious disregard of the substantial risk that such conduct might threaten the life, health, and safety of Plaintiff. Such conduct by Defendants evinced evil hands guided by evil minds thereby compelling an award of punitive damages.

## COUNT 2

### Strict Products Liability (Failure to Warn)

80.    Plaintiff incorporates each and every allegation above as if fully set forth herein.

81.    Plaintiff brings this strict liability claim against Defendants for failure to warn.

82.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, promoting and applying Gramoxone products, which are defective and unreasonably dangerous to agribusiness, including Plaintiff, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Gramoxone and specifically, the active ingredient Paraquat. These actions were under the ultimate control and supervision of Defendants.

83.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its Gramoxone products, and in the course of same, directly advertised or marketed the products to agribusiness and end users, including the Plaintiff, and

24

therefore had a duty to warn of the risks associated with the use of Gramoxone and Paraquat-containing products.

84.     At all times relevant to this litigation, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Gramoxone products did not cause users and agribusiness to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn the Plaintiff of the dangers associated with Gramoxone use and exposure.

85.     At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Gramoxone and Paraquat-containing products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

86.     At all times relevant to this litigation, Defendants failed to investigate, study, test, or promote the safety or to minimize the dangers to users and agribusiness of this product and to those who would foreseeably use or be banned by Gramoxone, including Plaintiff.

87.     Despite the fact that Defendants knew or should have known that Gramoxone posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of its products and the neurotoxic characteristics of Paraquat, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time it distributed, supplied or sold the product, and not known to end users and agribusiness, such as Plaintiff.

88. Defendants knew or should have known that these products created significant risks of serious bodily harm to agribusiness, as alleged herein, and Defendants failed to adequately warn agribusiness and reasonably foreseeable users of the risks of exposure to its products. Defendants has wrongfully concealed information concerning the dangerous nature of Gramoxone and its active ingredient Paraquat and further made false and/or misleading statements concerning the safety of Gramoxone.

89. At all times relevant to this litigation, Defendants' Gramoxone products reached the intended agribusiness, handlers, and users or other persons coming into contact with these products in Arizona and throughout the United States, including Plaintiff, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, marketed and sprayed/applied by Defendants.

90. Plaintiff was exposed to Gramoxone products, as described above, without knowledge of their dangerous characteristics.

91. At all times relevant to this litigation, Plaintiff was exposed to the use of Defendants' Gramoxone products in their intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

92. Plaintiff could not have reasonably discovered the defects and risks associated with Gramoxone or Paraquat-containing products prior to or at the time of Plaintiff's exposure. Plaintiff relied upon the skill, superior knowledge, and judgment of Defendants.

93. Defendants knew or should have known that the minimal warnings disseminated with or accompanying the application of Gramoxone products were inadequate, but they failed to communicate adequate information on the dangers and safe

use/exposure and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses, including agricultural and horticultural applications.

94.    The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled those exposed such as Plaintiff to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Gramoxone and Paraquat; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Gramoxone and Paraquat.

95.    To this day, Defendants has failed to adequately and accurately warn of the true risks of Plaintiff's injuries associated with the use of and exposure to Gramoxone and its active ingredient Paraquat, a probable carcinogen.

96.    As a result of their inadequate warnings, Gramoxone products were defective and unreasonably dangerous when they left the possession and/or control of Defendants, were sold or distributed by Defendants, were applied by Defendants, when Plaintiff became exposed.

97.    Defendants is liable to Plaintiff for injuries caused by negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant

27

information and data regarding the appropriate use of their products and the risks associated with the use of or exposure to Gramoxone and Paraquat.

98.    The defects in these Gramoxone products were substantial and contributing factors in causing Plaintiff's injuries, and, but for Defendants' misconduct and omissions, Plaintiff would not have sustained his injuries.

99.    Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Gramoxone products and application, Plaintiff could have avoided the risk of developing injuries as alleged herein and could have obtained alternative herbicides.

100.    As a direct and proximate result of Defendants placing defective Gramoxone products into the stream of commerce and exposing Plaintiff to them, Plaintiff has suffered and continues to suffer severe injuries, and has endured physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment. Plaintiff will continue to incur these expenses in the future.

101.    Plaintiff further alleges that Defendants knew or should have known that death and/or catastrophic injuries could occur due to its negligent, careless, and reckless conduct. Nonetheless, Defendants disregarded these dangers and the risks they posed. Such acts and/or omissions constitute willful, wanton, reckless and malicious behavior and/or a conscious disregard of the substantial risk that such conduct might threaten the life, health, and safety of Plaintiff. Such conduct by Defendants evinced evil hands guided by evil minds thereby compelling an award of punitive damages.

**COUNT 3**

**Negligence**

28

102.    Plaintiff incorporates each and every allegation above as if fully set forth herein.

103.    Defendants, directly or indirectly, caused Gramoxone products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Plaintiff.

104.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the design, research, testing, manufacturing, marketing, advertisement, supply, promotion, packaging, sale, and/or distribution of Gramoxone into the stream of commerce, including the duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

105.    At all times relevant to this litigation, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Gramoxone products. Defendants' duty of care owed to agribusiness and the general public included providing accurate, true, and correct information concerning the risks of using Gramoxone and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Gramoxone, and, in particular, its active ingredient Paraquat.

106.    At all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Gramoxone and specifically, the neurotoxic properties of the chemical Paraquat.

107.    Accordingly, at all times relevant to this litigation, Defendants knew or, in the exercise of reasonable care, should have known that use of or exposure to Gramoxone products could cause or be associated with Plaintiff's injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiff.

108.    Defendants also knew or, in the exercise of reasonable care, should have known that users and agribusiness of Gramoxone were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Gramoxone.

109.    As such, Defendants breached its duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and/or distribution of its Gramoxone products, in that Defendants manufactured and produced defective herbicides containing the chemical Paraquat, knew or had reason to know of the defects inherent in its products, knew or had reason to know that a user's or agribusiness's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

110.    Despite ability and means to investigate, study, and test products and to provide adequate warnings, Defendants has failed to do so.

111.    Defendants wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Gramoxone and Paraquat.

112.    The negligence by the Defendants, its agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Gramoxone products without thorough and adequate pre- and post- market testing;

b)    Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Gramoxone while

30

negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to Paraquat, and, consequently, the risk of serious harm associated with human use of and exposure to Gramoxone;

c) Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Gramoxone products were safe for their intended use in agriculture and horticulture;

d) Failing to use reasonable and prudent care in the design, research, manufacture, and development of Gramoxone products so as to avoid the risk of serious harm associated with the prevalent use of Gramoxone as an herbicide;

e) Not conducting sufficient testing programs and studies to determine Gramoxone's neurotoxic properties even after Defendants had knowledge that Gramoxone is, was, or could be neurotoxic;

f) Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Gramoxone, and the propensity of these ingredients to render Gramoxone toxic, increase the toxicity of Gramoxone, whether these ingredients are neurotoxic, magnify the neurotoxic properties of Gramoxone, and whether or not "inert" ingredients and/or adjuvants were safe for use;

g) Failing to petition the EPA to strengthen the warnings associated with Gramoxone;

31

h) Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Gramoxone;

i) Marketing, advertising, and recommending the use of Gramoxone without sufficient knowledge as to its dangerous propensities;

j) Advertising, marketing, and recommending the use of the Gramoxone products, while concealing and failing to disclose or warn of the dangers known by Defendants to be associated with or caused by the use of or exposure to Gramoxone;

k) Representing that Gramoxone was safe for use for its intended purpose, and/or that Gramoxone was safer than ordinary and common items such as table salt, when, in fact, Defendants knew or should have known that the products were unsafe;

l) Representing that Gramoxone had equivalent safety and efficacy as other forms of herbicides;

m) Designing Gramoxone in a manner which was dangerous to its users;

n) Manufacturing Gramoxone in a manner which was dangerous to its users;

o) Producing Gramoxone in a manner which was dangerous to its users;

p) Formulating Gramoxone in a manner which was dangerous to its users;

q) Concealing information from the Plaintiff while knowing that Gramoxone was unsafe, dangerous, and/or non-conforming with EPA regulations;

r) Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Gramoxone compared to other forms of herbicides;

s) Selling Gramoxone with a false and misleading label;

t) Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Gramoxone and Paraquat-containing products; and

u) Declining to make or propose any changes to Gramoxone products' labeling or other promotional materials that would alert the agribusiness and the general public of the risks of Gramoxone.

113. Defendants knew and/or should have known that it was foreseeable that agribusiness such as Plaintiff would suffer injuries as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Gramoxone.

114. Plaintiff did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Gramoxone or its active ingredient Paraquat.

115. Defendants' negligence was the proximate cause of the injuries, harm, and economic losses that Plaintiff suffered, and will continue to suffer, as described herein.

116.    As a proximate result of Defendants' wrongful acts and omissions in placing defective Gramoxone products into the stream of commerce without adequate warnings of the hazardous and neurotoxic nature of Paraquat, Plaintiff has suffered and continues to suffer severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering, has suffered economic losses (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

117.    Defendants' conduct, as described above, was reckless. Defendants regularly risks the lives of agribusiness and users of its products, including Plaintiff, with full knowledge of the dangers of its products. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspecting public, including Plaintiff. Defendants' reckless conduct therefore warrants an award of punitive damages.

118.    Plaintiff further alleges that Defendants knew or should have known that death and/or catastrophic injuries could occur due to its negligent, careless, and reckless conduct. Nonetheless, Defendants disregarded these dangers and the risks they posed. Such acts and/or omissions constitute willful, wanton, reckless and malicious behavior and/or a conscious disregard of the substantial risk that such conduct might threaten the life, health, and safety of Plaintiff. Such conduct by Defendants evinced evil hands guided by evil minds thereby compelling an award of punitive damages.

## **COUNT 4**

### **Breach of Implied Warranties**

119.    Plaintiff incorporates each and every allegation above as if fully set forth herein.

120.    At all times relevant to this litigation, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Gramoxone products, which are defective and unreasonably dangerous to agribusiness, including Plaintiff, thereby placing Gramoxone products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

121.    Before the time that Plaintiff was exposed to the use of the aforementioned Gramoxone products, Defendants impliedly warranted to agribusiness and those exposed-including Plaintiff-that Gramoxone products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as horticultural herbicides.

122.    Defendants, however, failed to disclose that Gramoxone has dangerous propensities when used as intended and that the use of and/or exposure to Gramoxone and Paraquat-containing products carries an increased risk of developing severe injuries, including Plaintiff's injuries.

123.    Plaintiff reasonably relied upon the skill, superior knowledge and judgment of Defendants and upon its implied warranties that the Gramoxone products were of merchantable quality and fit for their intended purpose or use.

124.    Upon information and belief, Plaintiff was at all relevant times in privity with Defendants.

125.    Plaintiff is the intended third-party beneficiary of implied warranties made by Defendants to the purchasers of its horticultural herbicides.

126.    The Gramoxone products were expected to reach and did in fact reach agribusiness and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

127. At all times relevant to this litigation, Defendants was aware that agribusiness and users of its products, including Plaintiff, would use Gramoxone products as marketed by Defendants, which is to say that Plaintiff was a foreseeable user of Gramoxone.

128. Defendants intended that Gramoxone products be used in the manner in which Plaintiff was exposed to them and Defendants impliedly warranted each product to be of merchantable quality, safe, and fit for this use, despite the fact that Gramoxone was not adequately tested or researched.

129. In reliance upon Defendants' implied warranty, Plaintiff used or was exposed to Gramoxone as instructed and labeled and in the foreseeable manner intended, recommended, promoted and marketed by Defendants.

130. Plaintiff could not have reasonably discovered or known of the risks of serious injury associated with Gramoxone.

131. Defendants breached its implied warranty to Plaintiff in that Gramoxone products were not of merchantable quality, safe, or fit for their intended use, or adequately tested. Gramoxone has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

132. The harm caused by Gramoxone products far outweighed their benefit, rendering the products more dangerous than an ordinary agribusiness or user would expect and more dangerous than alternative products.

133. As a direct and proximate result of Defendants' wrongful acts and omissions Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has

endured pain and suffering, has suffered economic loss (including significant expenses for medical care and treatment) and will continue to incur these expenses in the future.

134.    Plaintiff further alleges that Defendants knew or should have known that death and/or catastrophic injuries could occur due to its negligent, careless, and reckless conduct. Nonetheless, Defendants disregarded these dangers and the risks they posed. Such acts and/or omissions constitute willful, wanton, reckless and malicious behavior and/or a conscious disregard of the substantial risk that such conduct might threaten the life, health, and safety of Plaintiff. Such conduct by Defendants evinced evil hands guided by evil minds thereby compelling an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

A.    For general and special damages according to proof at trial.

B.    For punitive damages in such a sum, to be proven at trial, as may be necessary to punish the Defendants for its wrongful acts.

C.    For Plaintiff's costs incurred with interest at the highest lawful rate from the date of judgment until paid in full.

D.    For such other and further relief as the Court deems just and proper under the circumstances.

Respectfully submitted this 7th day of May 2026.

**BAILEY LAW FIRM, PLLC**

*/s/ Jenna Bailey*
Jenna C. Bailey
*Attorneys for Plaintiff*

37

On May 8, 2026, a courtesy copy of the foregoing will be mailed to the assigned Judge pursuant to section II.D.3. of the Electronic Case Filing Administrative Policies and Procedures Manual.

United States District Court
Clerk of the Court

By: *Jennifer DePoorter*